# In the Iowa Supreme Court

No. 24–1426

Submitted September 10, 2024—Filed September 11, 2024

**Nicholas Gluba, Charles Aldrich, and Marco Battaglia,**

Appellants,

vs.

**State Objection Panel,**

Appellee,

**Dan Smicker, Cynthia Yockey, Jack Sayers, Garrett Anderson, Trudy Caviness,** and **Elaine Gaesser,**

Intervenors-Appellees.

Appeal from the Iowa District Court for Polk County, Michael D. Huppert, judge.

Congressional candidates appeal from a district court order denying their challenge to a State Objection Panel decision removing their names from the general election ballot due to failure to comply with statutory nomination requirements. **Affirmed.**

Per curiam. Waterman, J., took no part in the consideration or decision of the case.

Jacob P. Heard (argued) and Julia A. Cutler of Iowa Defenders, PLLC, Clive, and Jennifer H. De Kock (argued) of Coppola Hockenberg, P.C., West Des Moines, for appellants.

Brenna Bird, Attorney General; Leif A. Olson, Chief Deputy Attorney General; Eric Wessan, Solicitor General; Patrick C. Valencia, Deputy Solicitor

General; and William C. Admussen (argued) Assistant Solicitor General, for appellee.

Alan R. Ostergren (argued) of Alan R. Ostergren, P.C., Des Moines, for intervenors-appellees.

Shayla L. McCormally of McCormally & Cosgrove, P.L.L.C., Des Moines, for amicus curiae Iowa Democratic Party and Democratic Congressional Campaign Committee.

**Per Curiam.**

We are asked to review a district court ruling upholding a decision by the State Objection Panel disqualifying three Libertarian Party of Iowa candidates for the United States House of Representatives from the 2024 general election ballot. Both the Panel and the district court found that the Libertarian Party had failed to comply with the statutory process for nominating candidates by convention. As set forth herein, we generally agree with their reasoning and therefore affirm the judgment below.

**I. Facts and Procedural History.**

Under Iowa law, political parties whose candidates received at least 2% of the vote in the previous year's gubernatorial or presidential elections may apply for official political party status. *See* Iowa Admin. Code r. 721—21.10. In the 2022 general election, the Libertarian Party candidate for governor received more than 2% of the total vote. The Libertarian Party filed for and was granted status as a qualified political party.

Qualified political parties generally select their general election candidates through a primary election. Iowa law provides, "Candidates of all political parties for all offices which are filled at a regular biennial election by direct vote of the people shall be nominated at a primary election at the time and in the manner directed in this chapter." Iowa Code § 43.3 (2024).

Iowa holds its primary election on the first Tuesday following the first Monday in June. *Id.* § 43.7. A congressional candidate qualifies for the primary election by filing nomination papers with the requisite number of signatures no later than 5:00 p.m. on the eighty-first day before the primary election. *Id.* § 43.11(2). Congressional candidates must file petitions with not less than 1,726 signatures of eligible electors, including at least 47 signatures from each of half

of the counties in their respective districts. *Id.* § 45.1(3).[1] A person may sign more than one petition for the same office. *Id.* § 45.6(1).

This year, at least one Democratic Party candidate and at least one Republican Party candidate filed nomination papers by the deadline for the offices of United States Representative in Congress for Iowa's first, third, and fourth congressional districts. No Libertarian candidates filed for those districts. At the June primary, the respective party voters selected the Democratic and Republican nominees for those districts whose names will appear on the November general election ballot.

Iowa law also provides a second path by which a political party may place a candidate on the general election ballot. Specifically, when there is a "vacancy" due to no candidate from that party having filed nomination papers to get on the primary ballot, the party may nominate a candidate. *Id.* § 43.78. For a congressional race, the nomination must occur at a congressional district convention. *Id.* § 43.78(1)(*b*). In the event the party makes such a nomination, the name of the candidate shall be submitted in writing to the secretary of state not later than 5:00 p.m. on the seventy-sixth day before the general election. *Id.* § 43.78(2).

The law prescribes a multi-step process for selecting the delegates to the congressional district conventions. First, local precinct caucuses meeting in the winter of each even-numbered year elect delegates to county conventions. *Id.* § 43.4(1). When the precinct caucuses select county convention delegates, those names are to be provided to the county auditor. *Id.* §§ 43.4(4), .91. Each county convention thus consists of delegates "elected at the last preceding precinct

---

[1] " '*Eligible elector*' means a person who possesses all of the qualifications necessary to entitle the person to be registered to vote, whether or not the person is in fact so registered." Iowa Code § 39.3(6).

caucus." *Id.* § 43.90. Further: "The term of office of delegates to the county convention shall begin *on the day following their election at the precinct caucus . . . .*" *Id.* § 43.94 (emphasis added).

When they convene, the county conventions in turn choose delegates to the congressional district conventions and the state convention. *Id.* § 43.97(3).

The Libertarian Party collapsed this process somewhat. By its own admission, it conducted precinct caucuses and county conventions on the same day, January 15, 2024. Following those precinct caucuses, the Libertarian Party failed to provide to any county auditor the names of any delegates. *See id.* § 43.4(4). At that time, i.e., January 15, delegates to the district conventions and state convention were purportedly selected.[2] Later, on June 8, the party had a state convention where it filled its ballot vacancies for United States Congress by nominating petitioners Nicholas Gluba, Marco Battaglia, and Charles Aldrich as the candidates for Iowa's first, third, and fourth congressional districts, respectively. On July 29, Gluba, Battaglia, and Aldrich filed certificates of nomination with the secretary of state.

Dan Smicker and Cynthia Yockey (first district), Trudy Caviness and Elaine Gassner (third district), and Jack Sayers and Garrett Anderson (fourth district) timely filed objections to those certificates of nomination. *See id.* § 43.24(1)(*a*), (*b*)(2). Each of these individuals resides in one of the nominees' congressional districts and is eligible to vote in the November 2024 general elections. Their objections challenged, primarily, the validity of the Libertarian Party's January 15 county conventions.

---

[2]Our record is sparse. There are no minutes of any Libertarian Party precinct caucuses or county conventions. We have an affidavit from the cochair of the Libertarian Party who states, with reference to January 15, "The Libertarian Party of Iowa held its county conventions in the same locations and at the same time as Caucuses." He also states, "Upon conclusion of the conventions, all participating counties submitted their lists of delegates to me."

Thereafter, the State Objection Panel, consisting of the secretary of state, auditor of state, and attorney general, scheduled a hearing to determine the validity of the nominations. *See id.* § 43.24(3)(*a*). Because all three separate actions involved nearly identical questions of law and fact, they were consolidated and the administrative hearing for all three petitioners was held on August 28.

In their motions and oral arguments, the objectors challenged the nominations as defective for two reasons: (1) the Libertarian Party failed to comply with Iowa's precinct caucus procedures by not filing the names of their elected county convention delegates within sixty days of their caucus, *see id.* § 43.4(4) ("Within sixty days after the date of the caucus the county central committee shall certify to the county [auditor] the names of those elected as . . . delegates to the county convention."); and (2) the Libertarian Party's district and state delegates were not authorized to nominate congressional candidates because the county convention delegates had not validly elected these delegates back on January 15, *see id.* § 43.94 ("The term of office of delegates to the county convention shall begin on the day following their election at the precinct caucus . . . .").

Following oral argument, the Panel voted 2–1 to sustain the objections and remove Gluba, Battaglia, and Aldrich from the general election ballot. The Panel found that because there were no county convention delegates whose term had begun on January 15 when the county conventions were held, any actions they took were invalid, including the selection of delegates to any district or state conventions. The Panel noted in a footnote that the Libertarian Party's failure to notify the county auditors of county convention delegates also failed to comply with Iowa law. One Panel member dissented on various grounds.

On September 3, Gluba, Battaglia, and Aldrich filed a petition in the Polk County District Court for judicial review of the Panel's decision and for a temporary injunction. That same day the district court granted the temporary injunction and enjoined the secretary of state from certifying the 2024 general election ballot pending judicial review. On September 5, a contested hearing was held in the district court.

Working over the weekend, the district court issued a thirteen-page ruling on Saturday, September 7, dissolving the injunction and affirming the Panel's decision in its entirety. The district court concluded that under Iowa Code section 43.94, "any action taken by a [county convention] delegate-elect on the day he or she is elected is not a valid exercise of their authority as a delegate." This meant that the June 8 district conventions allegedly formed by the January 15 county conventions were not valid. The court agreed with the Panel that strict compliance with this law was required.

Gluba, Battaglia, and Aldrich appealed and asked for expedited review. We retained the appeal and granted the request for expedited review. We are filing this opinion on an expedited basis based on the Panel's representation that the names of candidates for the general election ballot must be finalized by 11:59 p.m. on Wednesday, September 11.

**II. Standard of Review.**

Previously, we have "assumed without deciding that the State Objection Panel was an administrative agency from which judicial review could be sought under Iowa Code chapter 17A." *Schmett v. State Objections Panel*, 973 N.W.2d 300, 302 (Iowa 2022) (per curiam) (citing *Chiodo v. Section 43.24 Panel*, 846 N.W.2d. 845, 848 n.1 (Iowa 2014)). Here, as in those prior cases, the district court proceeded on that basis. Resolution of this matter "is not germane to our

determination in this expedited appeal." *Id.* (quoting *Chiodo*, 846 N.W.2d at 848 n.1). Thus, we will again assume without deciding that the Panel's decision is subject to chapter 17A judicial review.

We review objections to the Panel's interpretation of the relevant statutes for correction of errors at law. *Id.* at 303. "We review constitutional issues de novo." *Save Our Stadiums v. Des Moines Indep. Cmty. Sch. Dist.*, 982 N.W.2d 139, 143 (Iowa 2022).

### III. Legal Analysis.

Gluba, Battaglia, and Aldrich do not dispute that the process by which they were nominated did not comply with Iowa Code section 43.94, in that the term of the Libertarian Party county convention delegates who selected the Libertarian Party district convention delegates had not commenced on January 15, 2024. However, they raise several alternative grounds why the Panel erred in striking their candidacies from the November ballot.

**A. Standing.** We begin by addressing whether the objectors had standing to make their challenges before the Panel.

Gluba, Battaglia, and Aldrich argue that the objecting parties—not being members of the Libertarian Party—lack standing because they do not "have a special interest in the challenged action, 'as distinguished from a general interest.' " *Godfrey v. State*, 752 N.W.2d 413, 419 (Iowa 2008) (quoting *City of Des Moines v. Pub. Emp. Rels. Bd.*, 275 N.W.2d 753, 759 (Iowa 1979)). This argument incorrectly conflates the standing requirements for judicial review with the requirements for raising an objection before an agency. "To show aggrievement entitling one to judicial review, a party must demonstrate '(1) a specific personal and legal interest in the subject matter of the agency decision and (2) a specific and injurious effect on this interest by the decision.' " *Richards*

*v. Iowa Dep't of Revenue & Fin.*, 454 N.W.2d 573, 575 (Iowa 1990) (quoting *Iowa Power & Light Co. v. Iowa State Com. Comm'n*, 410 N.W.2d 236, 239 (Iowa 1987) (en banc)). By contrast, "a person may be a proper party to agency proceedings and not have standing to obtain judicial review." *Id.*; *see also Dickey v. Iowa Ethics & Campaign Disclosure Bd.*, 943 N.W.2d 34, 37–38 (Iowa 2020). The requirements to be a proper party to an agency proceeding are purely statutory.

Here, the statute provides,

> 1. *Written objections required.* Nomination petitions or certificates of nomination filed under this chapter which are apparently in conformity with the law are valid unless objection is made in writing.*a.* Objections to the legal sufficiency of a nomination petition or certificate of nomination filed or issued under this chapter or to the eligibility of a candidate may be filed in writing by any person who would have the right to vote for the candidate for the office in question. Objections relating to incorrect or incomplete information for information that is required under section 43.14 or 43.18 shall be sustained.

Iowa Code § 43.24(1)(*a*). This is broad language—i.e., "any person who would have the right to vote"—and the six objectors met the statutory requirements. *Id.* They are residents of the first, third, and fourth congressional districts, respectively, who would have the right to vote for the proposed Libertarian candidates in the general election. They therefore had standing to make objections before the Panel.

**B. Interpretation of Section 43.24(1)(*a*).** Gluba, Battaglia, and Aldrich next argue that the Panel and the district court misread Iowa Code section 43.24(1)(*a*). As quoted above, this provision authorizes the filing of "[o]bjections to the legal sufficiency of a nomination petition or certificate of nomination." *Id.* According to Gluba, Battaglia, and Aldrich, "legal sufficiency" refers only to deficiencies that appear on the face of the certificate. If the certificate meets the formal requirements of section 43.88, no further inquiry can be made. Thus, so

long as a purported "chairperson" and a purported "secretary" of a purported convention signed the certificate, no inquiry can be made as to whether there ever was a convention or whether any kind of candidate selection process occurred.

This is an incorrect and unduly narrow reading of "legal sufficiency." A nomination petition or a certificate of nomination can be "legally insufficient" for reasons other than obvious facial defects. In another context, we often say that a motion to dismiss tests the "legal sufficiency" of a petition. *See White v. Harkrider*, 990 N.W.2d 647, 650 (Iowa 2023). By that, we do not mean that the trial court may only consider the formal appearance of the petition. Rather, the court looks at the underlying substantive law and considers whether the petition states a valid legal claim under that law. *See id.* at 652–53.

We note that section 43.24(1) also provides, "Nomination petitions or certificates of nomination filed under this chapter which are apparently in conformity with the law are valid unless objection is made in writing." Iowa Code § 43.24(1). The logical inference from this language is that objections *can* be made when the certificate of nomination on its face appears to conform to the law but there is some other legal problem. Otherwise, the sentence would make no sense.

Another argument raised by Gluba, Battaglia, and Aldrich is that the exclusive remedy for any failure of the Libertarian Party to comply with the laws regarding party caucuses and conventions is set forth in Iowa Code chapter 39A. Chapter 39A is the "Election Misconduct and Penalties Act." Iowa Code § 39A.1(1). It sets forth a series of election-related crimes. *Id.* §§ 39A.2–5. Also, one section of the Act authorizes the secretary of state or a county auditor to "administratively provide a written notice and letter of instruction" in the case of

"an apparent technical violation." *Id.* § 39A.6(1). We view these provisions as supplementing rather than superseding the language of section 43.24(1)(*a*) authorizing registered voters to make objections to certificates of nomination.

Another argument raised by Gluba, Battaglia, and Aldrich is that section 43.24(1)(*a*) applies only to primary elections. We are not persuaded because the statute allows objections to certificates of nomination, not just nomination petitions. *Id.* at 43.24(1)(*a*). Certificates of nomination are used when there was no person selected at the primary. *See* Iowa Code § 43.88(1) (explaining that nominations by conventions "shall . . . be forthwith certified to the proper officer by the chairperson and secretary of the convention . . . and if such certificate is received in time, the names of such nominees shall be printed on the official ballot the same as if the nomination had been made in the primary election").

Amicus curiae Iowa Democratic Party makes another argument about section 43.24(1)(*a*), for which it relies on our decision in *Schmett v. State Objections Panel*, 973 N.W.2d 300. The amicus argues that in *Schmett,* we interpreted Iowa Code section 43.24(1)(*a*) as allowing only objections to "incorrect or incomplete information that is required under section 43.14 or 43.18" to be sustained. We do not read our *Schmett* decision so broadly. *Schmett* was a case about petition signing requirements. *See* 973 N.W.2d at 301. The specific issue in *Schmett* was whether a missing date, an item required by section 43.15(2) but not sections 43.14 or 43.18, should result in that signature not being counted. *Id.* We held that it should not. *Id.* at 304–05. We emphasized that the legislature "selected only a subset of the signing requirements as grounds for not counting signatures in section 43.14(2)(*c*) or sustaining objections in 43.24(1). And, seemingly, those are the more important signing requirements." *Id.* at 304. Thus,

*Schmett* stands for the proposition that objections based on signing requirements should be sustained only if the requirement is covered in sections 43.14 or 43.18.

*Schmett* does not address other types of legal objections. If the amicus were correct, no defect in the certificate of nomination itself—even a facial defect—could result in an objection being sustained. That does not make sense and is contrary to the position advanced by Gluba, Battaglia, and Aldrich that facial defects can be grounds for sustaining an objection.

We acknowledge what we said in *Schmett*, "Statutory interpretation is not like proving math theorems, and it is sometimes difficult to come up with a neat answer that is intellectually satisfying." *Id.* The election laws may not be the model of clarity. Still, a common sense reading of the term "legal sufficiency" supports the Panel's and the district court's rulings. By contrast, as acknowledged at oral argument, the approach advocated by Gluba, Battaglia, and Aldrich would leave a gap in our election laws. The Panel would have no ability to resolve, for example, a dispute between two candidates both claiming to have received a nomination for the same office at their party's convention.

**C. Strict or Substantial Compliance.** Gluba, Battaglia, and Aldrich further argue that there was substantial compliance with section 43.94 and that this was good enough. That is, even though the precinct caucuses and the county conventions were not separated by at least a day as required by law, or even occurred at the same time, that was a technical noncompliance that should be excused.

We believe that Iowa Code section 43.94 requires strict rather than substantial compliance. The general rule is that election laws governing candidate qualification for the ballot require strict compliance. *See* 29 C.J.S. *Elections* § 23, at 41 (2015) ("Election laws are mandatory and require strict

compliance. Substantial compliance can satisfy the requirements of a mandatory provision of an election statute and is acceptable only when an election provision expressly states that it is." (footnotes omitted)); *see also Staber v. Fidler*, 482 N.E.2d 1204, 1205 (N.Y. 1985) (per curiam) ("Broad policy considerations weigh in favor of requiring strict compliance with the Election Law . . . . Both the actual operation and public perception of the electoral process as one that seeks regularity and evenhanded application must not be distorted."); *State ex rel. Phillips v. Lorain Cnty. Bd. of Elections*, 757 N.E.2d 319, 323 (Ohio 2001) (per curiam) ("[T]he settled rule is that election laws are mandatory and require strict compliance, and that substantial compliance is acceptable only when an election statute expressly permits it.").[3] Iowa has many laws prescribing a substantial compliance standard; section 43.94 is not one of them. For example, section 43.14(1) allows nomination petitions to be "in substantially the form prescribed by" the secretary of state. Iowa Code § 43.14(1); *see also id.* § 43.10 (allowing blank nomination papers "which are in form substantially as provided by this chapter"). The affidavit accompanying nomination papers shall be "in substantially the form required by section 43.67." *Id.* § 43.88(3).

---

[3]A recent case from another jurisdiction applied strict compliance to candidates for judgeships selected at a party convention. *See Clinton v. Bd. of Elections of the N.Y.C.*, No. 157708/2021, 72 Misc. 3d 1221(A), 151 N.Y.S.3d 618 (Sup. Ct. Aug. 26) (unpublished table decision), *aff'd*, 197 A.D.3d 1025 (N.Y. App. Div. 2021) (mem.). In *Clinton v. Board of Elections of the City of New York*, a political party's original slate of delegates did not appear on the primary ballot because their petitions were "invalidated for failure to file a Cover Sheet." *Id.* at *3. Following the primary, the party met to fill the delegate positions anyway and submitted those names. *Id.* The delegates were challenged as not having been selected in accordance with New York law. *Id.* The party countered that "the strict requirements under the Election Law regarding defects in nominating papers" were inapplicable to "an internal party position" and the party should be able to govern its own nomination process. *Id.* at *11, *13. The New York court applied a strict compliance standard and invalidated the delegates and the judicial candidates they had purported to select. *Id.* at *13. The court quoted a prior case as follows: "Strict compliance with the Election Law, we have held, 'reduces the likelihood of unequal enforcement,' . . . '[t]he sanctity of the election process can be best guaranteed through uniform application of the law.' " *Id.* (alteration in original) (citation omitted) (quoting *Seawright v. Bd. of Elections in the N.Y.C.*, 150 N.E.3d 848, 851 (N.Y. 2020) (per curiam)).

*Wingert v. Urban*, 250 N.W.2d 731 (Iowa 1977) (en banc), illustrates the governing legal principles. We confronted there the question of what to do about a candidate who had been elected but whose candidacy had been challenged on the ground that his nomination petition lacked sufficient signatures. *Id.* at 731–32. We quoted the general proposition that "statutory provisions in regard to nominations are not regarded as mandatory in the sense that noncompliance with them vitiates the election, but only in the sense that officers or persons to whom they apply are obligated and may be compelled to comply with them prior to an election and are subject to the penalties prescribed by the statutes relating to offenses against election laws." *Id.* at 733 (quoting 25 Am. Jur. 2d *Elections* § 143). In other words, a strict compliance standard applies before the election, but not after the results are in. Ultimately, in *Wingert*, we held that because the district court had entered a preelection injunction in the winning candidate's favor keeping him on the ballot, the "mandatory" approach should apply, although we later found "exceptional circumstances" because the candidate had relied on the erroneous advice given to him by an election official. *Id.* at 735. *Wingert* supports a strict compliance standard here, given that the election has not occurred.

We are not persuaded that strict compliance with section 43.94 is fundamentally unfair. Gluba, Battaglia, and Aldrich could have qualified for the November general election ballot by filing nomination petitions with signatures like the other political party candidates. They relied instead on an alternative procedure afforded by Iowa law. Having done so, they had to be in compliance with that procedure. In sum, like the district court, we find that strict compliance was required and the Libertarian Party did not comply.

**D. First Amendment Arguments.** We now turn to whether the Panel's application of Iowa Code sections 43.24 and 43.94 violates the First Amendment associational rights of Gluba, Battaglia, and Aldrich or the Libertarian Party. Two distinct but related concepts are at issue here.

The first is the notion that candidates with a certain level of support should have a right of access to the general election ballot. Yet that right has limits. The United States Supreme Court has held that states have an "undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot . . . ." *Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983). The Supreme Court has "never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Munro v. Socialist Workers Party*, 479 U.S. 189, 194–95 (1986). States, for example, may even ban write-in voting under certain conditions. *See Burdick v. Takushi*, 504 U.S. 428, 441 (1992).

That right of access has not been infringed here. As previously noted, Gluba, Battaglia, and Aldrich could have qualified for the June 2024 primary by filing petitions with the requisite number of signatures. Had they done so, they would now be the Libertarian Party's general election nominees and would be on the November ballot. No claim is made that this threshold requirement for ballot access is an unconstitutional burden, and the Supreme Court has upheld far higher signature requirements than the one imposed by Iowa Code section 45.1(3). *See Norman v. Reed*, 502 U.S. 279, 295 (1992) (holding that petition signatures of approximately 2% of the electorate was not an undue burden); *Am. Party of Tex. v. White*, 415 U.S. 767, 783 (1974) (upholding requirement for nominating petition to have signatures from "1% of the vote for governor at the

last general election"); *Jenness v. Fortson*, 403 U.S. 431, 432, 442 (1971) (sustaining a requirement that a candidate who does not enter and win a political party's primary election can have their name printed on the ballot at the general election only if they had filed a nominating petition signed by at least 5% of the number of registered voters at the last general election for the office in question). Iowa law offers additional flexibility because a major party candidate like Gluba, Battaglia, or Aldrich may also appear on the general election ballot by going through the caucus-convention process.

The second notion is that political parties should have a right to associate and govern their internal affairs as they see fit. For example, the Supreme Court has held that parties may not be prohibited from making primary endorsements nor may states dictate certain aspects of internal party governance. *Eu v. S.F. Cnty. Dem. Cent. Comm.*, 489 U.S. 214, 229, 232–33 (1989). Also, parties may not be forced against their will to have general election candidates selected in a "blanket primary" that includes voters from other parties. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 585–86 (2000).

But this right also has limits. For instance, if state law provides otherwise, parties do not have a right to nominate candidates of other parties as their candidates (even if neither the candidate nor the other party objects) or to have members of other parties participate in their primary. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 369–70 (1997); *Clingman v. Beaver*, 544 U.S. 581, 595–97 (2005).

Here the burden on associational rights of the Libertarian Party strikes us as well within the boundaries tolerated by Supreme Court precedent. The Panel's ruling does not affect the Libertarian Party's ability to convey its message to the voters of Iowa, to make endorsements, to associate only with individuals it wants

to associate with, or even to determine its own governance structure.[4] The only effect of the Panel's application of sections 43.24 and 43.94 is to require the party to go through a more formal nomination process with clearly separate precinct caucuses and county conventions as its backup mechanism for selecting candidates in the event no candidate files for nomination by primary.

The Supreme Court has said, "We have considered it 'too plain for argument,' for example, that a State may require parties to use the primary format for selecting their nominees, in order to assure that intraparty competition is resolved in a democratic fashion." *Cal. Democratic Party*, 530 U.S. at 572 (quoting *Am. Party of Tex.*, 415 U.S. at 781). If it's too plain for argument that a state could require the Libertarian Party to select its candidates only by primary, it follows that the state may prescribe the format of the caucus-convention process that it allows the party to use as an alternative.

State law specifically requires that the county convention delegates elected at precinct caucuses assume their duties as delegates no earlier than the next day. *See* Iowa Code § 43.94. This short time delay imposes a modest burden by requiring truly separate precinct caucuses and county conventions.

Gluba, Battaglia, and Aldrich object that the requirement of two separate days for precinct caucuses and county conventions is arbitrary and hyper-technical. But many election rules are arbitrary and hyper-technical in the same sense. Why require forty-seven signatures from at least half of the counties? Why should that matter if a candidate has several thousand signatures and the entire district elects the representative? Gluba, Battaglia, and Aldrich do not contend

---

[4]The question presented here is not one of purely internal governance. It is one of procedure for a political party candidate to get on the general election ballot without having filed a nomination petition with signatures. Other provisions of chapter 43, relating to other subjects, such as Iowa Code sections 43.100 and 43.111, are not at issue in this case.

that the two-day requirement would have been too burdensome for the Libertarian Party to meet; it just wasn't met here.

**VI. Conclusion.**

For the foregoing reasons, we affirm the judgment of the district court.

**Affirmed.**

Waterman, J., takes no part.

Procedendo shall issue at 9:00 p.m. on September 11, 2024. This opinion will be published.